UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| **KANE PREE**, an individual, and **BLAKE PREE**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**PICKLE PRO, LLC**, a Florida limited liability corporation, and **TODD PREE**, an individual,<br><br>Defendants. | CIVIL ACTION<br><br>Case No. 2:17-cv-42<br><br>Judge: John E. Steele<br><br>Mag. Judge: Carol Mirando |

**PLAINTIFFS' MOTION FOR SANCTIONS
AND INCORPORATED MEMORANDUM OF LAW**

**NOW COME** the Plaintiffs, **KANE PREE** ("K. Pree") and **BLAKE PREE** ("B. Pree") (collectively "Plaintiffs"), and hereby file Plaintiffs' Motion for Sanctions and Incorporated Memorandum of Law, and in support states as follows:

**PROCEDURAL SUMMARY**

On January 24, 2017, the Plaintiffs filed their Complaint against Defendant Pickle Pro, LLC and Mr. Todd Pree, alleging (1) violation of the FLSA- unpaid wages and overtime, (2) breach of contract, and (3) promissory estoppel. (Doc. 1). In short, the Plaintiffs allege that they were employees of the Defendants and that the Defendants failed to pay them their lawful wages.

As a result of Defendant Pickle Pro's non-compliance with the Court's Orders, the Court recommended a default be entered against Pickle Pro and that its Answer & Affirmative Defenses (Doc. 30) be stricken. As the Court summarized:

1

> On July 6, 2017, previous counsel for Pickle Pro, LLC ("Pickle Pro") and Todd Pree filed a motion to withdraw as counsel of record, which the Court granted. Docs. 27, 28. The undersigned directed Pickle Pro to retain counsel and have counsel file a Notice of Appearance on or before August 23, 2017 because artificial entities can only act through agents. Doc. 28 at 2. Pickle Pro did not comply within the time permitted. On August 25, 2017, the Court provided one final opportunity to Pickle Pro to comply with the Order and retain counsel on or before September 1, 2017. Doc. 29. The Court indicated that Pickle Pro's failure to comply with the Order would result in the Court recommending default be entered against Pickle Pro. *Id*. at 1. As of this date, Pickle Pro has not responded to the Court's Orders (Docs. 28, 29).

Pickle Pro did not file any objections to the Report and Recommendations (Doc. 30) and the District Court adopted it. (Doc. 31). As a result, its Answer & Affirmative Defenses (Doc. 16) were stricken and default was entered on September 27, 2017. (Doc. 32). Pickle Pro being subject to a Clerk's Default and its Answer & Affirmative Defenses stricken, it thus admitted the allegations in the Complaint.

On December 29, 2017, the Plaintiffs filed their Motion for Summary Judgment (Doc. 39), which the Court granted on February 9, 2018. (Doc. 42). On March 5, 2018, the Court entered an Order (Doc. 46) directing the Clerk to enter judgment (in relevant part) as follows:

A. In favor of Kane Pree as to Count I in the amount of $20,835.00 for unpaid overtime wages, and an additional $20,835.00 in liquidated damages; and as to Count II in the amount of $36,265.25 in damages;

B. In favor of Blake Pree as to Count I in the amount of $17,362.50 for unpaid overtime wages, and an additional $17,362.50 in liquidated damages.

Consistent with the Court's Order, the Clerk entered Judgment against Pickle Pro on March 5, 2018. (Doc. 47).

Thereafter, the Plaintiffs have attempted to execute on the Judgment, but to no avail. As a result, on June 27, 2018, the Plaintiffs served a subpoena for a deposition in aid of execution on Mr. Todd Pree, managing member of Defendant Pickle Pro, LLC. (*See* Ex. 1, Affidavit of Service). The Subpoena directed Mr. Pree to attend a deposition scheduled for July 19, 2018 at 9:00 A.M.

at a court reporter's office in Collier County, Florida and to bring with him records relating to Defendant Pickle Pro, LLC. Notwithstanding being served with the subpoena, and notwithstanding Mr. Pree acknowledging the same in email correspondence, Mr. Pree refused to appear on July 19, 2018. (*See* Ex. 2, Certificate of Non-Attendance).

The Plaintiffs then re-served Mr. Pree with a second subpoena for a deposition in aid of execution on July 25, 2018. (*See* Ex. 3, Affidavit of Service). This Subpoena directed Mr. Pree to attend a deposition scheduled for August 20, 2018 at 9:00 A.M. at a court reporter's office in Collier County, Florida and to bring with him records relating to Defendant Pickle Pro, LLC. Thereafter, Mr. Pree sent undersigned counsel dozens of emails, many of which were threatening and obscenity-laden. This time, Mr. Pree did appear for his deposition and in so doing, attempted to make an utter mockery of the judicial system.

## **DEPOSITION OF TODD PREE[1]**

As Mr. Pree confirms, he knows how depositions work because he has "been in multiple depositions… [and could] give you the ground rules." (7:17-18). His representations notwithstanding, the deposition of Mr. Pree was nothing short of a circus as he decided to make a travesty of the entire proceeding. Because Mr. Pree was evasive, recalcitrant and outright abusive, a complete copy of the deposition of Todd Pree is attached so that the Court may view the questions and Mr. Pree's responses in their proper context. (*See* Ex. 4, Deposition of Todd Pree).

1. **Evasiveness.**

Throughout his deposition, Mr. Pree was evasive and often employed tactics designed to hinder the administration of justice. As a preliminary matter, Mr. Pree arrived at least 30-minutes late and the deposition scheduled for August 20, 2018 at 9:00 A.M. actually began at 9:32 A.M. However,

---

[1]    The deposition on August 20, 2018 was the first time Mr. Pree had met undersigned counsel. (8:13-15).

by only the third question, which was "[a]nd what's your middle name," Mr. Pree "needed a breather." (Ex. 4, 3:14-15). This kind of behavior continued, as exemplified by the following quoted portions of the deposition:

- Q Have you ever gone by any other aliases?
  A Like, in general?
  Q Yes.
  A Maybe.
  Q What are they?
  A I'm not going to disclose anything like that to you. (10:20-11:1).

- Q Have you ever gone by any other aliases; and, if so, what are those?
  A I refuse to answer on the grounds it may incriminate me.
  Q So, you're invoking your Fifth Amendment rights at this time as to that question?
  A As to that question, yes. (11:9-15).

- A … My lawyers helped me a bit with this last night. I spent about four hours on it.
  Q Who are those lawyers? What are their names?
  A They're not really my lawyers. I called lawyers. They aren't actually members of the bar.
  Q Okay. What are their names?
  A I'm not disclosing the names of my friends that used to be lawyers and got out of the business.
  Q What are their names, sir?
  A Proof of service –
  Q Mr. Pree, what are the names of those people you just mentioned?
  A I didn't mention any people.
  Q You mentioned friends who used to be members of the bar that were helping you.
  A They were imaginary. Did you have imaginary friends, Ben? (17:11-18:4).

Furthermore, Mr. Pree refused to comply with the Subpoena in any meaningful way by refusing to bring the requested documents, including insurance policies for Pickle Pro, LLC. (24:9-26:8). He also even denied that Pickle Pro, LLC employed the Plaintiffs. (36:16-39:8). But most concerningly, at almost any point that the questioning went to anything to do with sources of income, Mr. Pree refused to provide any meaningful answers. The following are but some examples:

- Q Who is your landlord?

    A I can't tell you, because I'm afraid of being stalked. (45:22-24);

- Q Are you refusing to provide your home address?
  A Yes, absolutely. (46:8-10);

- Q Where you live, is it a condominium?
  A I'm not answering, because I'm trying to remain anonymous, because I've had a lot of threats from my wife for my safety. I don't want to give you too many particulars because of my safety. (47:24-48:3);

- Q How do you pay your rent?
  A I'm not talking about my rent.
  Q Do you pay by check?
  A I'm not talking about my rent.
  Q Why not?
  A Because it's a question intended to humiliate me.
  Q No. It's a question that --
  A It's humiliating that I can't pay my rent, because I have no money, because Ben, Mr. Scumbag across the table, destroyed my company, so I can't pay my rent because of him. He is humiliating me by pointing out how poor I am, and then I get eviction notices on my door every month.
  Q Who puts the --
  A It is humiliating.
  Q Who puts eviction notices on your door?
  A The landlord.
  Q What's the landlord's name?
  A I refuse to answer, because I'm trying to hide --
  Q Have you ever --
  A -- my address.
  Q -- paid rent?
  A I am not talking about my personal rent.
  (50:24-51:23).

- Q You stated a moment ago that you have begged, borrowed, and stolen. I'm asking –
  A That's not income.
  Q I'm asking you a different question.
  A You asked me --
  Q From whom --
  A -- the same question.
  Q From whom have you begged or borrowed?
  A Can you please get to something relevant? (59:4-12).

- Q This is the question before you: From whom have you begged and borrowed?
  A As many people as I possibly can.
  Q Provide all of their names.

5

> A No.
> Q Why is that?
> A Because it is incriminating, embarrassing. It's meant to embarrass me and intimidate me. It is meant to be malicious. (59:17-25).

- Mr. Pree testified that he changes Pickle Pro, LLC's banks often:

> Q What about Pickle Pro, does it have any checking or savings accounts?
> A It has two, but they both have a negative balance of negative 3,000 or more.
> Q At what bank?
> A I don't know, I change so often. (64:1-6).

- Q What bank branch did –
  A I don't –
  Q -- Pickle Pro have?
  A -- know.
  Q Who would know?
  A I don't know. (68:12-17).

- "I have blackouts, so I'm not going to be able to answer any further, so I've answered your question." (70:3-5).

After Mr. Pree refused to provide any substantive financial information, undersigned counsel attempted to ascertain information regarding who else <u>would</u> have responsive information regarding Pickle Pro, LLC's finances and assets. But once again, Mr. Pree flatly refused:

> Q Do you know a gentleman named Tom Watson?
> A I don't know.
> Q You don't know a gentleman named Tom Watson?
> A I don't know if I know him or not.
> Q Sir, I asked you at the beginning of the deposition, but I think at this point I need to ask again. Are you under the influence of any drugs or medications here that affect your memory?
> A I am traumatized because you are asking me questions about a company that you destroyed. You are asking me for money -- you are asking me for money from a company that you destroyed, and you're the reason I don't have the money you're asking for.
> Q Are you under the influence of any drugs or medications that affect your memory here today?
> A I'm under the influence of PTSD, which is inflicted by you. PTSD is the only mental illness that can be inflicted by another person. That person is you.
> Q Tom Watson was a manager at Pickle Pro, LLC, was he not?
> A He wasn't a manager, he was the manager. He was the supervisor of --

6

he was the supervisor of your -- of your clients.
Q So, you do know him?
A Maybe.
Q You just testified explicitly that he was the supervisor of my clients. On what basis do you say maybe you know him?
A On the basis of my PTSD being very bad at the moment. I think I may be in a psychotic state.
Q What's Mr. Watson's address?
A I don't know.
Q Where does he live?
A I don't have that information. Move on to something relevant…
Q If we needed to serve him with a subpoena for deposition, where would we serve him?
A Up your ass.
Q Excuse me?
A Up your ass. (74:1-75:25)

- Q When was the last time you spoke to Mr. Watson?
  A I'm not answering these questions. They're irrelevant. (77:7-10).

- Q When was the last time you spoke to Mr. Watson?
  A I am not answering; it's irrelevant.
  Q Did you attend a court proceeding in Collier County on July 25th with Mr. Watson present?
  A Either I don't know or I'm not answering, because it's irrelevant. Please ask something that's relevant. (77:13-20).
  Q And what was his occupation when he was employed with Pickle Pro?
  A Chief operating officer. He ran the whole shebang.
  Q Did he handle Pickle Pro's finances?
  A Yeah.
  Q And do you still communicate with him?
  A Yeah.
  Q What's his telephone number?
  A I don't know.
  Q How do you communicate with him?
  A Irrelevant.
  Q How do you communicate with him, sir?
  A Irrelevant. I'm not answering. I don't know. (77:23-78:12).

- Q Mr. Pree, to answer a question, you either say you don't know or you just dodge it entirely. I'm not going to let this question go. How do you communicate with Mr. Watson? List all the ways.
  A You're asking this question to embarrass, harass, or threaten me. You are breaking a federal law at the moment. I will not be a victim to your abuse. Ask me a question that isn't breaking the law. (79:16-25)(*see also* 80:1-82:25).

7

Not only did Mr. Pree completely refuse to provide any substantive information regarding Mr. Watson, he also refused to answer any questions regarding selling off inventory in Pickle Pro, LLC's possession:

- A … So, what -- the way it works, Ben, is you're going to see me send existing inventory to Amazon, hopefully pretty soon.
  Q Why would you be doing that?
  A To satisfy the debt.
  Q Okay.
  A I have about -- I have about –
  Q How much inventory do you have?
  A I have about 50 or $60,000 of debt that's collateralized by the existing inventory. It's probably unlikely that I will be able to satisfy the debt against that inventory. (102:7-18)

- Q How much product are you planning on sending to Amazon?
  A As much as I can.
  Q Which is approximately how much?
  A I have no idea.
  Q Where is the product physically?
  A Some of it's already at Amazon.
  Q The product that you're referencing that you're planning on sending to Amazon, where is it located?
  A I don't know. (102:20-103:5)

- Q I'm going to ask you again: Where is the product?
  A I'm going to ask you again to comply with ADA federal and state laws.
  Q Okay. Where is the product, sir?
  A Some of it's at Amazon already.
  Q The stuff that you're planning on sending to Amazon, where is it?
  A I don't know.
  Q Why don't you know? Who else would know?
  A I'm not answering these questions, because they're meant to embarrass me. (104:15-105:2).

- Q Where is the product that you're planning on sending to Amazon?
  A You tell me.
  Q You just testified here under oath that you had product that you were going to be sending to Amazon to satisfy a debt you claim is owed to Amazon.
  A Batman --
  Q Where is that product located?
  A Batman and Superman, they have it.
  Q So, is it accurate that there is no product?

8

> A It's accurate that Batman and Superman have it. (106:15-107:1).
>
> - Q Where is the product that you're planning on sending –
> A I'm taking a breather.
> Q You take a breather, sir.
> A Do you know how much I love that company? Do you know that I built that specifically for my sons? Let's move on. I'm not going to answer whatever it was you were asking.
> Q I'm going to ask it one more time. Where is the product that you're planning on sending to Amazon? That's not yours, sir. That's the court reporter's. You're just going to throw it at me and leave?
> A I'm going to schedule a new date. We'll finish this another time.
> Q No, you're going to sit down right now. Would you rather have this deposition conducted before a federal judge?
> A Yes, please.
> MR. YORMAK: Okay. Let the record reflect that. The time is 11:24, the witness has left.
> (Deposition suspended.) (109:12-110:10).

Here too, any time undersigned counsel pressed Mr. Pree for any specific information that would aid in execution, Mr. Pree either refused to answer or was evasive in his response. As reprehensible as his conduct was in that regard, sadly, it pales in comparison to his conduct discussed below.

**2. Sanctionable Conduct.**

Mr. Pree's conduct throughout the deposition was as beyond the pale as undersigned counsel has ever seen. As the transcript reflects, Mr. Pree attempted to use much of the deposition to just attack undersigned counsel. Court involvement is necessary in order to ensure the orderly administration of justice. Some of the highlights are quoted below:

- "Don't say things that are stupid and I won't interrupt you." (26:23-24);

- "Ben is a criminal. He's a felon. I'm talking about Ben Yormak. He's a criminal. He filed a fraudulent lawsuit, with no merit." (34:12-14);

- "He is a violent criminal. He has inflicted a large amount of medical expenses." (35:6-7);

9

- Q Mr. Pree, do you understand that there is a judgment in excess of a hundred thousand dollars pending against Pickle Pro, LLC?
  A Maybe.
  Q You're the sole managing member, you testified to, and --
  A Do you agree that you're a violent criminal that has committed multiple felonies?
  Q Mr. Pree.
  A Mr. Fucking Yormak.
  Q Excuse me?
  A Fuck you. (35:21-36:7).

- "This low-life right across the table." (40:23).

- "It is always difficult for people to talk to their abuser. I am being forced to communicate with my abuser, who is Ben Yormak. He filed a fraudulent lawsuit against me, completely frivolous and malicious." (42:10-13).

- A You're a pedophile.
  Q -- you, sir -- Excuse me?
  A You are a pedophile.
  Q What's your home address?
  A You're a pedophile. I don't know my home address, I'm sorry. (45:1-7).

- Q Do you understand relevance is not a basis for an objection?
  A I understand that I'm a better lawyer than you, and that I know what's right and what's wrong, and I know it's wrong for you to abuse kids. (46:19-23).

- Q I didn't finish my question, sir. I have given you a ton of latitude to put out whatever falsehoods you want on this record, to not --
  A You --
  Q -- cut you off to be--
  A -- are the only falsehood in this room. (54:5-10).

- Q I apologize that this case offends you. But there's currently a hundred-thousand-plus-dollar judgment pending against Pickle Pro, LLC --
  A Because of your fraud.
  Q -- and we intend to get the information necessary --
  A Because you're a criminal.
  Q We will get the information necessary to execute on that judgment.
  A Because you're a criminal. (54:13-22).

- Q Mr. Pree, what's your occupation?
  A I need you to apologize.
  Q Mr. Pree, what's your occupation?
  A Mr. Fuckface, I need to you apologize. (56:9-12).

- Q How do you currently make money?

10

    A   I do not have an income at the moment --
    Q   Okay.
    A   -- because of Ben --
    Q   Wasn't the question.
    A   -- Yormak. And I will be suing him in a RICO. And if you cooperate, I will go easy on you. You need to testimony against others, in compliance with RICO. If you are a cooperating witness, I will make sure your jail time is minimal. (56:19-57:4).

- Q I don't answer questions here today, sir, you do.
  A It's because you're not smart. (66:2-4).

- Q What other banks issued Pickle Pro, LLC, a business debit or business credit card?
  A I don't know.
  THE COURT REPORTER: Oh, please, please. Would you mind, sir?
  THE WITNESS:   Yes, I mind.
  BY MR. YORMAK:
  Q Sir, take your feet off the table. Mr. Pree, please take your feet off of the...
  A I'm trying to relax, Ben. Let me catch my breath. This is a health issue. (71:4-15)(*see* Ex. 5).

- Q What would fresh your recollection?
  A It would refresh my recollection if you pay the health bills that I have incurred from the and felony assaults from you.
  Q Well, obviously, that's just absolutely untrue in every way, shape and form. So, what --
  A You are a felon. (73:4-11).

- Q Let me just be clear, so we can get past this line --
  A You're a --
  Q --of--
  A -- criminal. You are a felon.
  Q Mr. Pree, let me get past this line of questioning, so we can move on to something else.
  A Ben Yormak is a felon. This entire case is entirely frivolous. There's no merit to his case, no merit. He abuses my children, and he's a pedophile. (84:1-11).

- Q Do you --
  A -- fuck you --
  Q -- understand --
  A -- by the way?
  Q -- that?
  A Did you hear what I said?
  Q I'm sorry, what did you say at the end of your answer?
  A What did you say at the end of your answer?
  Q I believe that you said, quote, fuck you?
  A You said that. He just threatened me. (85:4-15).

11

- "You are a felon. Do you understand that you are a felon? Do you understand that I'm serious when I tell you this? Do you know how evil you are? You are a walking poop-stand." (87:9-13).

- Q How did you get here today, Mr. Pree?
  A Ben.
  Q How did you get here today?
  A For the love of God, ask me how we can work together to help my kids.
  Q You can start by paying them more than a hundred thousand dollars from the judgment that's pending in federal court.
  A Where do I get that money, you fuckface?
  Q Excuse me?
  A Excuse me? He just threatened me again. He threatened me again. I'm going to call the police from here, if you're going to keep this up.
  Q Mr. Pree, this is being audio recorded in addition to being transcribed.
  A Okay.
  Q You can take whatever action you deem appropriate. Take your feet off of the table. (88:23-89:18).

- Q Did you drive your truck to get to this deposition?
  A How do you -- how do you suggest I get money to my kids? Can you get -- I'm -- okay. I'm asking you -- you're a father. You have beautiful kids and a beautiful wife, by the way. (89:11-17).

- Q Mr. Pree --
  A These children had no credit rating. They were afraid to talk on the phone. They had no education. They were children. But you felt the desire to put it into the press that these children secretly owned this business. That destroyed us, sir. That destroyed a company that I fucking loved.
  Q Sir, stop yelling.
  A I loved that company with all my heart and 1 did everything I fucking could to keep it from going under, from your destruction. I had employees crying in their offices.
  Q Stop screaming.
  A In their offices, they were crying –
  Q Stop screaming.
  A -- when you put it into the press that my children secretly owned it. Us opening that store was our last chance of surviving. Governor Scott agreed -- his staff agreed with Tom Watson to attend that grand opening.
  Q Where is the product you're sending to Amazon?
  A You are going to let me finish.
  Q That's the only question pending, sir.
  A Governor Scott agreed to come to the grand opening until he saw the lies that you put out to the public. That destroyed our business. Every single day --
  (Knock at the door.)

>UNIDENTIFIED ATTORNEY:  Can you guys tone it down, please? We're trying to take a deposition.
>THE WITNESS: Go fuck off. (107:17-108:24).

As seen from the last excerpt from Mr. Pree's deposition, he became so loud that an attorney that was in another room trying to conduct a deposition had to enter the room where Mr. Pree was testifying. In keeping to form, Mr. Pree told that attorney to "[g]o fuck off." Mr. Pree's conduct is unconscionable and is designed to make a mockery of the judicial process and judicial system as a whole. His sheer lack of respect for all involved in the Court process is nothing short of disgusting. As discussed below, sanctions are very plainly warranted and <u>the sanctions imposed ought to be the most severe in nature</u>.

## MEMORANDUM OF LAW

**I.   Severe Sanctions Are Due to be Imposed.**

**A.  Legal Standard.**

[O]nce a pro se litigant is in court, he is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure." *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989). Of course, a party "may depose, any person, including a party, without leave of court except as provided in Rule 30(a)(2)." District courts enjoy substantial discretion in deciding whether and how to impose sanctions. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997). Rule 37 allows district court judges broad discretion to fashion appropriate sanctions for discovery violations. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993). This Rule allows for sanctions when a party fails to comply with a discovery order or fails to attend its own deposition. *See* Fed. R. Civ. P. 37(b)(2)(A), (d)(1)(A)(i). For both of these offenses, the Rule authorizes a variety of sanctions, such as, striking pleadings, rendering a default judgment, and holding the disobeying party in contempt of court. *Id.* at 37(b)(2)(A)(iii), (vi), (vii); 37(d)(3); *see*

also *United States v. Certain Real Prop. Located at Route 1, Bryant*, 126 F.3d 1314, 1317 (11th Cir. 1997).[2]

The Supreme Court has also held that the intent behind Rule 37 sanctions is both "to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763-64, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) (*quoting National Hockey League v. Metropolitan Hockey Club*, Inc., 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (per curiam). This deterrence is necessary because "it is not the court's function to drag a party kicking and screaming through discovery." *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 134 (S.D. Fla. 1987).

Rule 11 of the Federal Rules of Civil Procedure also provides a basis for sanctions. Sanctions imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Appropriate sanctions may include "nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* "The purpose of Rule 11 sanctions is to reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Thomas v. Early Cty., Ga.*, 518 F. App'x 645, 647 (11th Cir. 2013) (internal quotation marks and citation omitted). An objective standard is used in determining whether sanctions are appropriate under Rule 11.

---

[2] Moreover, as the Eleventh Circuit has held,

> Courts have the inherent power to police themselves and those appearing before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991). The key to unlocking that inherent power is a finding of bad faith. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998). Once unlocked, the power carries with it the authority to assess attorney's fees as a sanction for bad faith conduct. *Chambers*, 501 U.S. at 45-46, 111 S.Ct. at 2133.

To allow Mr. Pree to boldly defy the Court process in this manner would be to "enable[] litigants to 'flout' the court's discovery orders and needlessly delay the case." *Reed v. Fulton Cty. Gov't*, 170 F. App'x 674, 676 (11th Cir. 2006). Bad faith may be found through "delaying or disrupting the litigation or hampering enforcement of a court order." *Eagle Hosp. Physicians, LLC V. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). The Court ought to find that Mr. Pree engaged in the above-described misconduct with the subjective intent to abuse the judicial process. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223-24 (11th Cir. 2017) ("The key to unlocking a court's inherent power is a finding of bad faith."). Thus, only the severest of sanctions will deter him and other like him from this kind of behavior.

### B. An Order for Contempt is Due to Be Issued to Mr. Pree.

Throughout the course of this litigation, Mr. Pree's conduct has been an impediment to the judicial process. As the Court noted on various occasions in its orders, Mr. Pree (as the sole owner of Defendant Pickle Pro, LLC) has consistently refused to comply with various orders, which led to the default judgment. Now, he has refused to provide answers to questions of undersigned counsel at his deposition, refused to produce relevant documents requested by subpoena, and refused to otherwise respect and abide by the rules and orders of this Court. His conduct is nothing short of outrageous and is firmly calculated to make an utter mockery of the judicial system- his deposition testimony speaks clearly to this. The record suggests that Mr. Pree's behavior was nothing other than willful contempt of court. As a result, it is respectfully submitted that a finding of contempt is warranted for his wanton and willful abuse of the discovery and judicial process. The imposition of lesser sanctions would underrepresent the seriousness of the offensive conduct.

Courts have the inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966);

*Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991). The Eleventh Circuit has made clear that "[d]istrict courts have broad discretion in fashioning civil contempt sanctions." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir.1990). Generally, sanctions for civil contempt serve one of the following purposes: (1) to coerce the contemnor into compliance with the Court's order; or (2) to compensate the complainant for losses sustained as a result of the contumacious behavior. *United States v. United Mine Workers*, 330 U.S. 258, 303-04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The Plaintiffs request both forms of sanctions.

Coercive incarceration is within the inherent power of the Court, insofar as it depends on the contemnor's ability to comply, thereby purging himself of contempt, and is designed to coerce, rather than punish and therefore the ordinary requirements of due process do not attach. *Shillitani v. United States*, 384 U.S. 364, 369-70, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966); *see also S.E.C. v. Solow,* 396 Fed. Appx. 635 (11th Cir. 2010) (affirming district court's adjudication of civil contempt and ordering defendant's incarceration until he purged his contempt in compliance with the court's directive). With civil contempt, "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 844, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) (internal quotation omitted). Accordingly, sanctions imposed for civil contempt to coerce compliance "cannot be any greater than necessary to ensure such compliance" and may not be so excessive as to be punitive in nature. *Citronelle—Mobile Gathering, Inc.* 943 F.2d at 1304; In re Trinity Industries, 876 F.2d 1485, 1493 (11th Cir. 1989).

In this case, the appropriate sanction for Mr. Pree's outrageous behavior is the use of the civil contempt process. That is the one remedial tool in the Court's possession that will serve the purpose of coercing Mr. Pree's compliance with the Court's rules and processes so that Plaintiffs'

16

proceedings supplementary to execution of a judgment may move forward without further delay. As Mr. Pree has testified to being impecunious, monetary sanctions just will not have the necessary coercive effect on him. Mr. Pree's company, Pickle Pro, LLC, is already indebted to Plaintiffs for over $100,000.00 and it has yet to make any payment toward the principal of that debt. The imposition of potential coercive incarceration is likely the only means of achieving compliance in this matter. Accordingly, it is respectfully requested that an order of civil contempt and sanctions be entered and that Mr. Pree be commanded to appear for incarceration unless and until he purges himself of civil contempt by re-attending a deposition, producing all requested documents and providing answers to <u>all</u> questions, failing which a warrant ought to be issued for his arrest.[3] The imposition of lesser sanctions would underrepresent the seriousness of the offensive conduct and would not serve to achieve Mr. Pree's compliance.

## **CONCLUSION**

In light of the foregoing undisputed facts and applicable law, the Plaintiffs respectfully request that this Court grant the Plaintiffs' Motion, and award all other relief deemed just.

Respectfully submitted,

Dated: September 9, 2017
*/s/ Benjamin H. Yormak*
Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Plaintiffs
Yormak Employment & Disability Law
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com

---

[3] Summary punishment may only be imposed under narrowly circumscribed conditions, such as when the offensive behavior amounts to intentional obstruction of ongoing court proceedings. *U.S. v. Brannon,* 546 F.2d 1242, 1248 (5th Cir. 1977). It is respectfully submitted that summary punishment is appropriate under these circumstances. Indirect contempt is committed outside the court's presence. One accused of indirect contempt, or direct contempt that does not merit summary punishment, is entitled to reasonable notice of the charges and a separate contempt hearing. *U.S. v. Hankins,* 624 F.2d 649, 652-53 (5th Cir. 1980).

## **L.R. 3.01(g)**

While Local Rule 3.01(g) requires conferral for most motions, undersigned counsel respectfully submits that, given the above and given Mr. Pree's behavior throughout these proceedings, that compliance with Local Rule 3.01(g) is not possible, or is at minimum not possible in any meaningful way.

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2018, I electronically filed the foregoing (and exhibits) with the Clerk of Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

Mr. Todd Pree
Pickle Pro, LLC
3527 Plover Ave, Unit 2 Naples, FL 34117

*/s/ Benjamin H. Yormak*
Benjamin H. Yormak